**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JAN 30 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

JULIET D'SOUZA,

                Plaintiff,

    v.

ZEENA LOBO and NEIL LOBO,

                Defendants.

---

CV 09 0410

COMPLAINT

PLATT, J.

LINDSAY, M.J.

## PRELIMINARY STATEMENT

Plaintiff alleges upon knowledge as to herself and her acts, and upon information and belief as to all other matters as follows:

1. Plaintiff Juliet D'Souza (hereinafter referred to as "Ms. D'Souza" or "Plaintiff") was hired as a domestic worker by the Defendants, Neil Lobo and Zeena Lobo (hereinafter referred to collectively as "Defendants," or "Neil Lobo" and "Zeena Lobo"), in their home in Melville, New York for approximately six (6) months. Defendants Neil and Zeena Lobo are a married couple. Lynette Lobo, who resides in the same household, is Neil Lobo's mother. Plaintiff performed housekeeping duties, cared for Neil and Zeena Lobo's three children, and prepared meals for Defendants, Lynette Lobo, and the children.

2. Defendants brought Ms. D'Souza from India to the United States through fraudulent means. Defendants held her in a condition of peonage, involuntary servitude, and forced labor during the six months she was with them through threats and through a pattern of behavior that caused Ms. D'Souza to reasonably and justifiably believe that harm would come to her if she failed to continue performing the duties assigned by Defendants or if she otherwise reported Defendants' conduct to authorities.

1

3. Defendants failed or refused to pay Plaintiff the federal and state minimum wage.

4. During the period of on or about July 26, 2006 until on or about January 13, 2007, Plaintiff consistently worked more than forty-four (44) hours per week. Defendants forced Ms. D'Souza to work in their home for more than one hundred (100) hours per week. Defendants failed or refused to pay Plaintiff any overtime premiums. Defendants failed or refused to pay Ms. D'Souza spread of hours pay: an additional hour of pay for those days in which the interval between the time she started and ended work was more than ten hours. .

5. In this action, Plaintiff seeks redress for the violations of her rights under the Thirteenth Amendment to the United States Constitution and the Trafficking Victims Protection Reauthorization Act (TVPRA) prohibiting involuntary servitude, peonage, and forced labor, as well as federal and state labor laws, including lawful minimum wages and overtime premiums, plus spread of hours pay, liquidated damages, attorney's fees, and costs.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 216 (b) and 18 U.S.C. § 1595 (a).

7. This Court has supplemental jurisdiction over the Plaintiff's state claims pursuant to 28 U.S.C. § 1367 (a) and 29 U.S.C. § 216 (b) because these claims are so closely related to Plaintiff's federal claims that they form parts of the same case or controversy under Article III of the United States Constitution.

8. Venue is proper pursuant to 28 U.S.C. § 1391 (b), as events giving rise to this action occurred within this district, and Defendants reside in this district.

9. The Plaintiff demands a trial by jury on each and every claim as pled herein.

## PARTIES

10. At all times relevant to this action, Plaintiff was a domestic worker in the household of Defendants Neil Lobo and Zeena Lobo, residing in the State of New York.

11. At all times relevant to this action, Defendants resided at 51 Cabriolet Lane, Melville, New York 11747 and, upon information or belief, still reside at this address.

## STATEMENT OF FACTS

12. Ms. D'Souza served as a domestic worker from on or about July 26, 2006 until on or about January 13, 2007.

13. At all times relevant to this action, Ms. D'Souza worked at the Defendants' home located at 51 Cabriolet Lane, Melville, New York 11747.

14. At all times relevant to this action, Ms. D'Souza lived with Defendants, Lynette Lobo, and Defendants' three children. Upon information or belief, the children's ages were 12 years old, 8 years old, and 3 months old when Ms. D'Souza first started working for Defendants.

15. At all relevant times to this action, Defendants had the power to hire Ms. D'Souza.

16. At all relevant times to this action, Defendants had the power to fire Ms. D'Souza.

17. At all relevant times to this action, Defendants had the power to set the schedule of Ms. D'Souza.

18. At all relevant times to this action, Defendants had the power to supervise Ms. D'Souza.

19. At all relevant times to this action, Defendants had the power to control the work conditions in the household.

20. At all relevant times to this action, Defendants never paid Ms. D'Souza the proper federal minimum wage for all of her hours of work for Defendants.

21. At all relevant times to this action, Defendants never paid Ms. D'Souza the proper New York State minimum wage for all of her hours of work for Defendants.

22. At all relevant times to this action, Defendants never paid Ms. D'Souza New York State overtime for her hours over forty-four (44) hours per week of work for Defendants.

23. At all relevant times to this action, Defendants failed or refused to pay Ms. D'Souza spread of hours pay: an additional hour of pay for those days in which the interval between the time she started and ended work was more than ten hours.

24. At all relevant times to this action, Defendants willfully and intentionally did not maintain proper records for Ms. D'Souza's work schedule and pay.

25. Defendants willfully and intentionally failed to pay Ms. D'Souza her lawful wages.

26. At all relevant times to this action, Defendants did not post signs or posters from the U.S. Department of Labor indicating the laws regarding the minimum wage and overtime pay, or otherwise provide her any information about her rights under the federal or state employment laws.

### Recruitment and Transportation

27. Ms. D'Souza was born in Mangalore, Karnataka, India. She resided in India prior to working for Defendants.

28. In or about Fall 2005, Ms. D'Souza and Zeena Lobo agreed over the phone that Defendants would hire Ms. D'Souza as a live-in domestic worker responsible for Defendants' three children. Ms. D'Souza and Zeena Lobo agreed that she would work eight (8) hours per day, five (5) days a week for two (2) years, and Defendants would pay

4

Ms. D'Souza 25,000 to 30,000 rupees (about $584.00 to $701.00) per month. Ms. D'Souza and Zeena Lobo also agreed that Ms. D'Souza would not have to work during nights or weekends.

29. Between on or about Fall 2005 and on or about July 26, 2006, Ms. D'Souza spoke with Zeena Lobo over the telephone approximately ten (10) times before coming to the U.S. During those phone conversations, Zeena Lobo made repeated assurances to Ms. D'Souza that she would be well-taken care of and told her not to worry about anything.

30. Zeena Lobo promised Ms. D'Souza that she would have her own room at their house in New York.

31. In addition to her wages, Zeena Lobo promised Ms. D'Souza that she would pay for her traveling expenses and travel document (including passport and visa) costs.

32. Zeena Lobo told Ms. D'Souza that Defendants would obtain a work visa and employment authorization for Ms. D'Souza in order for her to come to the United States and work for Defendants.

33. Instead of applying for a work visa, Defendants obtained a B1/B2 type visitor's visa for Ms. D'Souza. Ms. D'Souza did not understand the code categories for U.S. visas and did not know she received a visitor's visa at the time Defendants brought her to the United States.

34. Ms. D'Souza received her visa and other travel documents in or about February 2006.

35. On or about July 25, 2006, Ms. D'Souza arrived to the United States.

36. Upon Ms. D'Souza's arrival, Defendants met her at the airport and took her to their home. When she arrived at their residence, Defendants took Ms. D'Souza's return plane ticket.

### *Duties and Hours*

37. Beginning on or about July 26, 2006 until on or about January 13, 2007, Defendants required Ms. D'Souza to work seven days a week and to be on-call 24 hours a day. During her period of work for Defendants, Defendants did not allow Ms. D'Souza to take any days off.

38. Except for one day during Ms. D'Souza's work for Defendants, Ms. D'Souza was never alone in the Lobo residence.  She was with Defendants and/or with Defendants' children at all times.

39. Ms. D'Souza's childcare duties included, but were not limited to, looking after the three children throughout the day, feeding the children, and caring for Defendants' infant child during the day and throughout the night.

40. In addition to caring for the three children, Ms. D'Souza was required to perform numerous housekeeping duties, including, but not limited to, vacuuming, dusting, sweeping, mopping, cleaning the kitchen, hand-washing the dishes, ironing, washing the laundry daily, hanging the washed clothes to dry, and folding and ironing laundry.  Ms. D'Souza also cleaned all fifteen rooms of the house, including five bathrooms and five bedrooms, cooked at least three meals, and prepared afternoon snacks for the children daily.  Ms. D'Souza was required to take care of the plants in the Defendants' greenhouse and carry heavy bottles of drinking water into the house from the garage.

41. During the course of her work for Defendants, Ms. D'Souza's sleep was regularly interrupted by Defendant's infant child, Anica Lobo (hereinafter "Anica"), in the middle of the night.

6

42. During the first month of Ms. D'Souza's work for Defendants, Anica slept in Defendants' bedroom inside her crib. Throughout that time, Zeena Lobo brought Anica to Ms. D'Souza every night at around 2 or 3 a.m., when Anica woke up crying, and left her in Ms. D'Souza's care.

43. Around the beginning of the second month of Ms. D'Souza's work for Defendants, Neil and Zeena Lobo placed Anica's crib in Plaintiff's room. They also moved Anica's toys, diapers, and clothes into Ms. D'Souza's room. They instructed Ms. D'Souza to take care of the baby during the day and night. During that time, Ms. D'Souza shared sleeping quarters with Anica. At times, Anica slept in Ms. D'Souza's bed. Anica did not sleep through the night. As a result, Ms. D'Souza was unable to sleep more than three hours at a time each night.

44. Ms. D'Souza was often required to clean and do other tasks while watching Anica at the same time. As a result, she incurred a shoulder injury.

45. During the time that Ms. D'Souza worked for Defendants, Ms. D'Souza worked in excess of over one hundred (100) hours per week.

### *Wages*

46. Beginning on or about July 26, 2006, until on or about September 26, 2006 (2 months), Defendants paid Ms. D'Souza, on average, approximately $642.00 per month. Defendants decided to send 25,000 rupees (approximately $584.00) to Ms. D'Souza's family in India and paid Ms. D'Souza $100.00.

47. On or about October 26, 2006 (1 month), Defendants paid Ms. D'Souza approximately $1,000.00 per month.

48. Beginning or about November 26, 2006, through or about December 26, 2006 (2 months), Defendants paid Ms. D'Souza approximately $1,200.00 per month. On or about January 10, 2007, Defendants paid Ms. D'Souza approximately $500.00.

49. Defendants told Ms. D'Souza not to not tell anyone how much she was paid.

50. Defendants purchased medicine and phone cards for Ms. D'Souza and subsequently deducted the cost of those purchases from her wages.

51. In all periods of Ms. D'Souza's work for Defendants, Defendants never paid Ms. D'Souza the proper federal minimum wage rate, which was $5.15 at all times relevant to this action.

52. In all periods of Ms. D'Souza's work for Defendants, Defendants never paid Ms. D'Souza the proper state minimum wage, which was $6.75 per hour from the beginning of Ms. D'Souza's work period and $7.15 after January 1, 2007.

53. In all periods of Ms. D'Souza's work for Defendants, Defendants never paid Ms. D'Souza overtime premiums for her work over forty-four (44) hours per week, in violation of New York State Labor Law.

54. In all periods of Ms. D'Souza's work for Defendants, Defendants did not pay Ms. D'Souza an additional hour of pay for those days in which the interval between the time she started and ended work was more than ten hours.

55. Upon information or belief, Defendants willfully and intentionally failed to maintain proper records of Ms. D'Souza's schedule, actual hours worked, and pay.

## *Isolation and Psychological Coercion*

56. Zeena Lobo severely restricted Ms. D'Souza's movements, preventing her from leaving the house unaccompanied, and monitored her movements. Ms. D'Souza was allowed to go outside alone only to get the morning newspaper and to take out the garbage.

57. Zeena Lobo allowed Ms. D'Souza to go outside with Anica for about five to ten minutes at a time when Defendants or Lynette Lobo were home. When Zeena Lobo allowed Ms. D'Souza to take Anica out for a walk, she told Ms. D'Souza not to cross the street. She told Ms. D'Souza that if anyone saw her and asked her what she was doing, she should tell them that she was a relative and not mention that she was working for Defendants.

58. Defendants allowed Ms. D'Souza to leave their home to go to church or the doctor but only when accompanied by Defendants.

59. When Ms. D'Souza first arrived, Defendants had another worker who came to clean the house once a week. Upon information or belief, her name was Andrea. Defendants monitored the conversations between Ms. D'Souza and Andrea by listening to them. Andrea left approximately three weeks after Ms. D'Souza arrived, at which time, Defendants began to require that Ms. D'Souza do the work Andrea was doing in addition to the work she had been previously assigned.

60. Defendants did not show Ms. D'Souza the surrounding neighborhood and area around Defendants' home. Ms. D'Souza could not identify her location on a map or understand where she was in relation to New York City.

61. Zeena Lobo told Ms. D'Souza that if she went out somewhere on her own, she would get lost. Zeena Lobo told Ms. D'Souza that she would not know where to go if trouble came.

62. Zeena Lobo repeatedly told Ms. D'Souza that if she ever contacted or spoke with the police, the police would arrest her and send her back to India.

63. Zeena Lobo told Ms. D'Souza that Ms. D'Souza could not open a bank account in the United States because she was not a citizen. She also told Ms. D'Souza that there were many fees if she ever tried to send money to India herself and that it was better for Defendants to do it themselves.

64. Defendants only allowed Ms. D'Souza to eat after they had already finished eating their meals and after she cleaned up after them. Ms. D'Souza ate in the kitchen corner or in the room where she slept. Zeena Lobo often watched Ms. D'Souza as Ms. D'Souza put food on her own plate, which made Ms. D'Souza very uncomfortable. Ms. D'Souza ate the leftovers from the Lobos' meals.

65. Sometimes Zeena Lobo bought food especially for the children, such as burgers or bagels. Zeena Lobo sometimes cut off a small piece for Ms. D'Souza to try, but only after she specified to Ms. D'Souza how much that small portion cost.

66. Defendants allowed Ms. D'Souza to only make overseas phone calls with a phone card to her family in India. Defendants did not show Plaintiff how to make phone calls within the United States.

67. To obtain the phone card, Ms. D'Souza gave Zeena Lobo her own money. Zeena Lobo then went out and bought the phone card for her.

68. Upon information and belief, Defendants regularly monitored Ms. D'Souza's overseas phone calls by listening to her telephone conversations.

69. Defendants told Ms. D'Souza to not tell anyone that she was working for them.

70. Defendants regularly scolded and reprimanded Ms. D'Souza.

71. On or about October 2006, Ms. D'Souza called Ms. Castalino in India.  Ms. D'Souza complained to Ms. Castalino that she was being given too much work and she was not allowed to rest.  She also told Ms. Castalino how much Defendants paid her.  Ms. Castalino called Defendants' home and told Defendants what Ms. D'Souza said to her. Defendants became irate.  Neil Lobo threatened to send Ms. D'Souza back to India because they had told her not to tell anyone about her wages.  Neil Lobo called Ms. D'Souza "greedy" and a "beggar."

72. Lynette Lobo eventually showed Ms. D'Souza how to make domestic phone calls. However, Lynette Lobo warned Ms. D'Souza that Zeena Lobo was able to keep track of all of Ms. D'Souza's phone calls because Defendants had Caller ID.

73. In or about October 2006, Ms. D'Souza tried to apply for another job about which she found out from Andrea.  When the potential employer called Ms. D'Souza, Defendants picked up the phone instead and spoke with the employer.  Afterwards, Lynette Lobo told Ms. D'Souza that the other employer could get in trouble with the police if Ms. D'Souza left to work for her.  As a result, Ms. D'Souza was too frightened to pursue this alternative employment opportunity.

74. Ms. D'Souza routinely asked Defendants to take a day off but Defendants refused to give it to her.

75. Defendants threatened Ms. D'Souza, when they became angry with her, that she would be allowed leave their household only after she reimbursed them for all of the expenditures they spent on her – an alleged amount of approximately $2,000.00.  These expenditures included Ms. D'Souza's visa, airplane ticket, and other travel expenses.

11

Ms. D'Souza did not have funds to pay off these expenditures, and she was afraid to be indebted to Defendants. As a result, she was forced to remain in Defendants' employ.

### *Effect on Plaintiff*

76. All of the Defendants' threats, manipulation, and isolation of Ms. D'Souza made her feel trapped, afraid, intimidated, and coerced into staying with Defendants. Defendants' restrictions on Ms. D'Souza made her feel as if she was a prisoner in Defendants' home.

77. Since Ms. D'Souza's escape from Defendants, she has been diagnosed with Post-Traumatic Stress Disorder (PTSD) and insomnia as a result of Defendants' mistreatment of her.

## FIRST CLAIM FOR RELIEF

### Forced Labor

### (18 U.S.C. §§ 1589, 1595)

78. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

79. Plaintiff is authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act. 18 U.S.C. § 1595.

80. Defendants knowingly obtained the labor and/or services of Plaintiff by means of a scheme, pattern, or plan intended to cause Plaintiff to believe that, if she did not perform such labor or services, Plaintiff or her family would suffer serious harm or physical restraint.

81. Defendants knowingly obtained the labor and/or services of Plaintiff by taking her return airline ticket and by other means of abuse or threatened abuse of law or legal process.

82. Defendants' knowing and intentional acts constitute a violation of 18 U.S.C. § 1589.

83. Plaintiff suffered injuries as a result of these actions.

## SECOND CLAIM FOR RELIEF

### Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor

(18 U.S.C. §§ 1590, 1595)

84. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

85. Plaintiff is authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act. 18 U.S.C. § 1595.

86. Defendants knowingly recruited, transported, and obtained Plaintiff by fraud for labor and services for the purpose of subjecting her to involuntary servitude, debt bondage, or slavery.

87. Plaintiff suffered injuries as a result of these actions.

88. Plaintiff is entitled to an award of compensatory and punitive damages to be determined, damages as a result of pain and suffering, attorneys' fees, and costs.

## THIRD CLAIM FOR RELIEF

### Slavery, Peonage, and Involuntary Servitude

(U.S. Const. amend. XIII, 18 U.S.C. §§ 1581 and 1584, 42 U.S.C. § 1994)

89. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

90. Defendants held Plaintiff in a condition of peonage, in violation of the Thirteenth Amendment of the U.S. Constitution, 18 U.S.C. § 1581, and 42 U.S.C. § 1994.

91. Defendants knowingly and willfully held Plaintiff in involuntary servitude, in violation of 18 U.S.C. § 1584, which incorporates the Thirteenth Amendment's bar on slavery and involuntary servitude.

92. Defendants knowingly and willfully brought Plaintiff to the U.S. to be held in a condition of involuntary servitude, in violation of 18 U.S.C. § 1584, which incorporates the Thirteenth Amendment's bar on slavery and involuntary servitude.

93. Plaintiff suffered injuries as a result of these actions.

94. Plaintiff is entitled to an award of compensatory and punitive damages to be determined, damages as a result of pain and suffering, attorneys' fees, and costs.

## FOURTH CLAIM FOR RELIEF

## Federal Labor Standards Act (FLSA) Minimum Wage Violation

### (29 U.S.C. § 201, et seq.)

95. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

96. Because Plaintiff was employed as a domestic worker in a household at all times relevant to this action, Plaintiff was engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 206(a).

97. Section 6(a), as amended by the Fair Minimum Wage Act of 2007, 29 U.S.C. § 206(a), provides that any employee engaged in commerce shall be paid wages at a rate not less than $5.15 per hour during the period of Plaintiff's employment.

98. In all periods of Plaintiff's employment, Defendants knowingly paid Plaintiff an hourly rate far less than the federal minimum wage, in violation of 29 U.S.C. §§ 206 and 218.

99. Defendants' willful and intentional failure to pay Plaintiff the minimum wage violates 29 U.S.C. § 201, et seq. and the U.S. Department of Labor regulations.

100. Defendants did not act in good faith when they failed to comply with federal minimum wage law.

101. Plaintiff is entitled to an award of damages for unpaid minimum wages in an amount equal to the proper federal minimum wage Plaintiff should have been paid, liquidated damages, attorney's fees, and costs.

## FIFTH CLAIM FOR RELIEF

### New York State Minimum Wage Violation

(N.Y. Lab. L. §§ 190 et seq. and 650 et seq.)

102. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

103. At all times relevant to this action, Plaintiff was employed by Defendants within the meaning of New York Labor Law §§ 2 and 651.

104. At all times relevant to this action, Defendants were employers within the meaning of the New York Labor Law.

105. In all periods of Plaintiff's employment, Defendants willfully failed to pay Plaintiff the proper minimum wage, as required by New York state law. N.Y. Lab. L. § 650 et seq.

106. As of January 1, 2006, New York law required New York employers to pay employees at least $6.75 per hour for each hour of time worked up to forty-four (44) hours of work per week, as codified in N.Y. Lab. L. § 652.

107.   As of January 1, 2007, New York law required New York employers to pay employees at least $7.15 per hour for each hour of time worked up to forty-four (44) hours of work per week, as codified by N.Y. Lab. L. § 652.

108.   Defendants knowingly, deliberately, and voluntarily disregarded their obligation to pay state minimum wages.

109.   Pursuant to New York Labor Law § 663, an employer who willfully fails to pay wages and overtime required by the Minimum Wage Act, shall be liable, in addition to the amount of any under-payments, for liquidated damages equal to twenty-five percent of the total of such under-payments found due to the employee.

110.   Plaintiff is entitled to an award of damages for unpaid minimum wages in an amount equal to the proper state minimum wage Plaintiff should have been paid, liquidated damages, attorneys' fees, and costs.

## SIXTH CLAIM FOR RELIEF

### New York State Overtime Violation

(N.Y. Lab. L. §§ 190 et seq. and 650 et seq., N.Y.C.R.R. § 142-2.2)

111.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

112.   In all periods of Plaintiff's employment, Defendants willfully failed to pay Plaintiff overtime premiums for work in excess of forty-four (44) hours per week.

113.   Defendants' knowing and deliberate failure to pay Plaintiff overtime premiums for work over 44 hours per week violates New York Labor Law §§ 190, et seq. and 650 et seq. and New York Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.2.

114.   Plaintiff is entitled to an award of damages for overtime pay for work over forty-four (44) hours per week in amount equal to the proper overtime premiums Plaintiff should have been paid, liquidated damages, attorneys' fees, and costs.

## SEVENTH CLAIM FOR RELIEF

### New York State Spread Of Hours Violation

(N.Y. Lab. L. §§ 190 et seq. and 650 et seq. and N.Y.C.R.R. § 142-2.4)

115.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

116.   Defendants willfully failed to pay Plaintiff an extra hour's pay for every day that she worked in which the interval between her start and end time exceeded ten hours, in violation of N.Y. Lab. L. §§ 190 et seq. and 650 et seq. and New York State Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.4.

117.   Plaintiff is entitled to an award of an extra hour's pay for every day that Plaintiff worked in excess of ten hours in an amount pursuant to N.Y. Lab. L. §§ 190 et seq. and 650 et seq. and New York State Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.4, liquidated damages, attorneys' fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that a judgment be granted as follows:

(a) Awarding Plaintiff unpaid wages, including minimum wages, plus liquidated damages and interest thereon, pursuant to 29 U.S.C. § 216(b) and New York Labor Law §§ 190, *et seq.*, 198, 652(1), 663;

(b) Awarding Plaintiff overtime pay, spread of hours pay, and liquidated damages and interest thereon, pursuant to New York Labor Law §§ 190, *et seq.*, 198, 652(1), 650, 663;

(c) Awarding Plaintiff punitive and compensatory damages for pain and suffering pursuant to the Thirteenth Amendment of the US Constitution and its incorporating statute, 18 U.S.C. § 1584, and the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595;

(d) Awarding Plaintiff attorney's fees and costs; and

(e) Awarding Plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
January 30, 2009

IVY O. SURIYOPAS, Esq.
Asian American Legal Defense and
Education Fund (IS 6541)
99 Hudson St., 12th Fl.
New York, NY 10013
(212) 966-5932

18

THE LEGAL AID SOCIETY
Steven Banks, Attorney in Chief
Scott Rosenberg, Attorney in Charge,
 Law Reform, Civil Practice (SAR 5579)
Hollis Pfitsch, of Counsel (HP 0522)
199 Water Street, 3d Floor
New York, New York 10038
Tel: (212) 577-3465
Fax: 212-509-8761

Attorneys for Plaintiff

19